UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| RICHARD HART, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:09-CV-1946 CAS |
| ) | |
| UNITED STATES OF AMERICA, et al., ) | |
| ) | |
| Defendants. ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter is before the Court following a four-day bench trial. The above-captioned cause of action was filed pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 et seq. The plaintiff, Richard Hart, claims he received improper medical care when he was a patient at the St. Louis Veterans Administration Medical Center – John Cochran Division. Having considered the pleadings, trial and deposition testimony, and exhibits, the Court hereby makes and enters the following findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

### *I. Findings of Fact*

**A. Plaintiff's medical background**

Plaintiff Richard Hart suffers from cervical dystonia, an involuntary movement disorder that causes his neck to twist and turn to the side resulting in pain and discomfort. Joint Stipulation of Fact ("JSF"). Plaintiff has suffered from cervical dystonia for over ten years. There is no cure for cervical dystonia. There is only treatment for the symptoms. Trial Tr., Vol. I at 60-61.

In addition, Mr. Hart suffers from chronic obstructive pulmonary disease ("COPD"), also know as emphysema; migraine headaches; alcohol abuse; gastroesophageal reflux disease ("GERD"); and degenerative disease in the cervical region at C5, C6 and C7. Trial Tr., Vol. II at 15-16; 18; Pan Video Dep. at 39; Def. Ex. Y.

### B. Botulinum toxin injections

An effective treatment for cervical dystonia is onabotulinumtoxinA ("Botox") and other botulinum toxin injections. Pan Video Dep. at 12; Trial Tr., Vol. I at 57, Trial Tr.,Vol. III at 8. Botox, which is administered through localized injections, relaxes the muscles and alleviates the twist and tilt. Trial Tr., Vol. III at 8. More specifically, Botox blocks the muscle from contracting by inhibiting the release of neurotransmitters from the nerve terminal to the muscle. Trial Tr., Vol. IV at 6; Pan Video Dep. at 13. While Botox is an effective treatment, it is transient, which means its effect only lasts weeks and possibly months. Trial Tr., Vol. I at 14; Trial Tr., Vol. III at 24. A cervical dystonia patient receiving Botox treatments must return to his or her doctor to receive additional injections at various intervals.

Determining Botox dosages for the treatment of cervical dystonia is based on a doctor's individualized assessment of the patient's clinical situation. Trial Tr., Vol. I at 62, 64; Trial Tr.,Vol. IV at 7. While there are recommended dosages for Botox injections, a doctor determines the proper Botox dosage for a particular patient using the recommended dose ranges, while at the same time taking into account the patient's clinical condition, the severity of the pain, the turning of the head, and the patient's muscle mass. Trial Tr., Vol. I at 17-18; Pan Video Dep. at 4-6, 22-23.

The time between Botox treatments will also vary. As stated above, Botox is a transient drug, and medical providers will administer an additional treatment once the prior treatment is no

longer effective in alleviating a patient's symptoms. There was testimony that the average interval between Botox injections for cervical dystonia is twelve weeks. Pan Video Dep. at 78. But twelve weeks is merely an average. There is nothing in the Botox package insert that recommends a 12-week interval for treating cervical dystonia with Botox. Trial Tr., Vol. I at 18; 66. As discussed in more detail below, the experts in this case disagree as to how quickly the effects of Botox can wear off. Consequently, they also disagree as to what should be the minimum amount of time between Botox treatments.

While Botox is often used to treat cervical dystonia, it does have many listed side effects. Dysphagia, or difficulty swallowing, is a commonly reported adverse event following treatment of cervical dystonia patients with Botox. Def. Ex. B; Pl. Ex. 5; Pan Video Dep. at 19-21; Trial Tr., Vol. I at 24-26, 82. The Botox package insert also warns that subsequent to the finding of dysphagia, patients have developed aspiration pneumonia. Pl. Ex. 5.

### C. Dr. Pan's Treatment

Dr. Yi Pan was employed at the St. Louis Veterans Administration Medical Center – John Cochran Division at the time she administered Botox to Mr. Hart. JSF; Pan Video Dep. at 13. Dr. Yi Pan is board certified in Neurology and Clinical Neurophysiology and she has been using Botox to treat patients with cervical dystonia since 1997. Pan Video Dep. at 8.

Dr. Pan began treating Mr. Hart in 2003. Pan Video Dep. at 32. Dr. Pan was aware that prior to the treatments Mr. Hart received in August and October 2007 – the treatments at issue in this case – Mr. Hart had received Botox and other botulinum toxin injections to varying degrees of effect. Pan Video Dep. at 32-34; Def. Exs. C, D, E, F and H.

3

Dr. Pan administered a treatment of Myobloc, another botulinum toxin, to Mr. Hart on June 18, 2007. Pan Video Dep. at 40-41; Def. Ex. I. Following this treatment, Mr. Hart called Dr. Pan and told her that his pain was little reduced and that he developed dry mouth, a known side effect of Myobloc. Pan Video Dep. at 42-43. Mr. Hart returned to Dr. Pan on August 20, 2007. Dr. Pan noted that Mr. Hart complained of neck and shoulder pain and spasticity. Pan Video Dep. at 48-49; Def. Ex. J. She characterized Mr. Hart's pain as constant. Pan Video Dep. at 49. After a discussion with Mr. Hart about his prior treatment and after performing a physical examination of Mr. Hart, Dr. Pan recommended that Mr. Hart receive 300 units of Botox instead of the Myobloc. Pan Video Dep. at 44-45; Def. Ex. J. Dr. Pan discussed the Botox treatment with Mr. Hart. She informed him that the treatment was transient, and that there were potential side effects including lack of improvement, pain, infection, allergic reaction, dry mouth and dysphagia. Mr. Hart consented to the Botox treatment. Pan Video Dep. at 46; Def. Ex. J. Dr. Pan injected plaintiff with 300 units of Botox on August 20, 2007. The Botox doses for each muscle injected were within the recommended dosing guidelines. Pan Video Dep. at 47; Def. Ex. G; Trial Tr., Vol. I at 75.

On October 5, 2007, Mr. Hart returned to Dr. Pan in a great deal of pain. Pan Video Dep. at 49; Def. Ex. K. Dr. Pan performed a physical examination of Mr. Hart and determined that he did not have any muscle weakness, instead his head was still turned and had a tilt to the left indicating that his muscles were still contracting due to cervical dystonia. Pan Video Dep. at 50, 52; Def. Ex. K. Dr. Pan documented that Mr. Hart told her that the treatment on August 20, 2007, provided him some relief and less dry mouth, but about two weeks prior his neck spasticity had returned. Pan Video Dep. at 50-51; Def. Ex. J. When Dr. Pan examined Mr. Hart on October 5, 2007, she noted that because of his head and neck position, it was her opinion that the Botox dose

4

administered on August 20, 2007, either had worn off or only had a partial effect. Pan Video Dep. at 59.

Dr. Pan recommended an increased dose of 400 units of Botox. She believed that the prior dose might have been too low. And in order to avoid frequent injections, Dr. Pan recommended that Mr. Hart received an increased dose, so that the effect might last longer and reduce his pain. Pan Video Dep. at 53; Def. Ex. K. Dr. Pan again discussed the Botox treatment with Mr. Hart. She informed him that the treatment was transient, and that there were potential side effects including lack of improvement, pain, infection, allergic reaction, dry mouth and dysphagia. Mr. Hart consented to the Botox treatment. Pan Video Dep. at 53-54; Def. Ex. K. Dr. Pan injected plaintiff with 400 units of Botox on October 5, 2007. The Botox doses for each muscle injected were within the recommended dosing guidelines. Pan Video Dep. at 54; Def. Ex. G; Trial Tr.,Vol. I at 75; Pl. Ex. 46.

Following the Botox treatment on October 5, 2007, plaintiff suffered a number of serious side effects, including dysphagia that was so severe that it required the insertion of a feeding tube. Plaintiff also suffered from aspiration pneumonia that required four thoracentesis procedures and surgical decortication in February 7, 2008. Pl. Exs. 15, 53, 54, 56, and 57; Trial Tr.,Vol. II at 6. Furthermore, plaintiff claims that he still suffers from dysphagia to this day as a result of the Botox injections. In addition, he testified that he continues to experience aspiration requiring him to sleep upright, and he has shortness of breath.

**D.     Expert Testimony**

Plaintiff retained Robert J. Friedman, M.D., to testify regarding the standard of care and causation. Dr. Friedman is a neurologist and pain specialist, who practices at the Headache and Pain

Center in West Palm Beach, Florida. Trial Tr., Vol. I at 6. Dr. Friedman is board certified in Neurology, Pain Medicine, and Neuromuscular Medicine. Id. at 7. Dr. Friedman testified that he has used Botox injections for the treatment of cervical dystonia.

Dr. Friedman testified generally about how Botox and other botulinum toxin injections work when they are injected into a patient's body. He stated that once injected it takes a few days for a botulinum toxin to take full effect, and "then it lasts for a number of weeks to months." Trial Tr., Vol. I at 14. More specifically, Dr. Friedman testified that Botox's maximum effect starts around two weeks, and it begins to wear off around three to four months. Id. at 15. When asked when was the soonest he had seen the effects of Botox wearing off, Dr. Friedman responded, "Well, it depends how you define that. Whether you're talking about completely wearing off or you're talking about assessing pain or dystonia, spasm of the muscle, but the latest I've seen a clear response of pain and movement and had it wear off that I was sure it was wearing off of the Botox was around 10 or 11 weeks." Id. at 15-16.

Dr. Friedman also offered his opinion about Botox dosing and the requisite amount of time between treatments. Friedman testified that the average dosage for Botox injections is 200 units, but that amount can vary, and the administration of 400 units can be appropriate. He testified that he has injected patients above 400 units. Trial Tr., Vol. I at 84. As for the interval between treatments, Dr. Friedman testified that although it can vary, the average interval for treating patients with Botox with cervical dystonia is twelve weeks. He also testified that he has never treated patients with therapeutic dosages of Botox in intervals of less than eight weeks. Trial Tr., Vol. I at 43, 65.

When asked to give an opinion as to Dr. Pan's course of treatment, Dr. Friedman testified that injecting Botox within a couple weeks short of the 12-week average interval is not necessarily a breach of the standard of care, but injecting Botox at six weeks "was too risky." Id. at 69-70. He further testified that Dr. Pan knew or should have known that the biochemical effect of Botox had not worn off, which would make Mr. Hart more prone to the side effects of Botox. Id. at 48. As for the course of treatment Dr. Pan should have taken, Dr. Friedman testified that further Botox injections could have been considered, but they should have been delayed. Id.

Defendant retained Jeffrey Gelblum, M.D., to testify regarding the standard of care and causation. Trial Tr., Vol. III at 4-5. Dr. Gelblum is a neurologist practicing in Miami, Florida, who is board certified in Neurology by the American Board of Psychiatry and in Neurology and Neuromuscular Disease by the American Board of Electrodiagnostic Medicine. Trial Tr., Vol. III at 5-6; Def. Ex. RR. Dr. Gelblum has a large practice and treats cervical dystonia patients with Botox about three times a week. Trial Tr., Vol. III at 8.

Dr. Gelblum testified that Botox is transient and that its effect typically wears off, on average, after a couple of months, although its effects can be shorter or longer. Trial Tr., Vol. III at 15. Dr. Gelblum also reviewed Mr. Hart's medical records, and he testified that the care Dr. Pan provided to plaintiff for the treatment of cervical dystonia was "completely appropriate." Trial Tr., Vol. III at 15-16. According to Dr. Gelblum, Mr. Hart presented on October 5, 2007 with "documented complaints of a recurrence of this well-documented diagnosed disorder." Trial Tr., Vol. III at 15. Mr. Hart responded to prior Botox treatments and "[b]asically there are no other treatment options based upon his specific clinical presentation." Trial Tr., Vol. III at 15-16. Dr. Gelblum testified that given Mr. Hart's presentment on October 5, 2007, which indicated that the

symptoms of cervical dystonia had returned, he would have provided the same treatment Dr. Pan administered. Trial Tr., Vol. III at 25. It is Dr. Gelblum's opinion within a reasonable degree of medical certainty that the care and treatment Dr. Pan provided on both August 20, 2007, and October 5, 2007 were within the standard of care for a neurologist. Trial Tr., Vol. III at 25-26. Dr. Gelblum testified that it was within the "[c]ommunity standard of care, reasonable, related, medically necessary, and without alternative option." Id.

Plaintiff also retained Gary Salzman, M.D., a physician board certified in Internal Medicine, Pulmonary Disease and Critical Care Medicine to testify. Trial Tr., Vol. I at 93. Dr. Salzman testified that in his opinion Mr. Hart currently suffers from dysphagia, or trouble swallowing, as a result of the Botox from October 2007. Trial Tr., Vol. I at 105. In addition, Dr. Salzman testified that in his opinion Mr. Hart suffers from an increase in shortness of breath due to the Botox he received in October 2007. Trial Tr., Vol. I at 105.

Dr. Salzman, however, has no experience administering Botox. Id. at 110. Dr. Salzman admitted that according to the literature he reviewed for this case, "generally for most patients, the [side] effects should wear off in three to four months." Trial Tr., Vol. I at 107-08. Dr. Salzman could not find any articles documenting any long term effects from Botox and recognized that there is no "real data on that." Trial Tr., Vol. I at 109. See also Trial Tr., Vol. I at 146. Dr. Salzman's opinion is based on the "temporal connection" between Mr. Hart's symptoms and the Botox. Trial Tr., Vol. I at 110-11.

Dr. Salzman conceded that the modified barium swallow test is a good indicator of someone's ability to swallow. Trial Tr., Vol. I at 114. Dr. Salzman conceded that Mr. Hart had several barium swallow tests that showed no objective problems with Mr. Hart's ability to swallow.

8

Trial Tr., Vol. I at 113. Dr. Salzman also conceded that dysphagia can be caused by other illnesses including cervical dystonia itself and GERD. Trial Tr., Vol. I at 124, 127-28.

There is nothing in medical literature to support Dr. Salzman's opinion that Mr. Hart's claims of continued shortness of breath can be attributed to the Botox. Trial Tr., Vol. I at 136-37. Dr. Salzman admitted that the pulmonary function test is an objective test that shows someone's breathing difficulty. Trial Tr., Vol. I at 137. Dr. Salzman agreed that Mr. Hart's total lung capacity had essentially not changed since he received the Botox treatments at issue. Trial Tr., Vol. I at 138-39; Def. Ex. BBB. Dr. Salzman also agreed that Mr. Hart's FEV1 values – which measures a patient's forced expiratory volume in one (1) second – were virtually unchanged. Trial Tr., Vol. I at 139-40; Def. Ex. BBB.

Defendant retained Stephen Steinberg, M.D., to testify regarding causation. Trial Tr., Vol. IV at 2. Dr. Steinberg is board certified in Internal Medicine, Hematology, Oncology and Gastroenterology, and board eligible in Nutrition. Trial Tr., Vol. IV at 3; Def. Ex. RR.

Dr. Steinberg opined that it would be very difficult to conclude that plaintiff's current symptoms were the result of the long-term effects of Botox. Trial Tr., Vol. IV at 5. Specifically, according to Dr. Steinberg "there's no evidence, no explanation and no data that suggests that his ongoing subjective complaint represents true dysphagia [] and certainly no evidence that it could or does represent a complication of Botox." Trial Tr., Vol. IV at 19-20. Dr. Steinberg found no evidence that the 2007 Botox injections caused long-term dysphagia, and found no evidence that Mr. Hart even has dysphagia as measured by objective tests. Trial Tr., Vol. IV at 10-11.

According to Dr. Steinberg, Mr. Hart suffered from an episode of dysphagia after the October 5, 2007 Botox injections, a known and common side effect of Botox. In addition, this

episode resulted in aspiration pneumonia, also a known side effect of Botox. Mr. Hart had a pleural effusion related to that and underwent a decortication, but there were no ongoing events. Trial Tr., Vol. IV at 20-21, 36-37. Further, Mr. Hart's pleural effusion did not cause any long-term pulmonary function issue as evidenced from the results of the pulmonary function tests performed before and after the Botox treatments, which were essentially identical. Trial Tr., Vol. IV at 21.

Dr. Steinberg also noted that Mr. Hart had numerous swallow tests that were determined to be normal, including three bedside swallow tests and five barium swallow tests from multiple providers. Trial Tr., Vol. II at 32-50; Trial Tr., Vol. IV at 12-13; Def. Exs. BBB, DD, BB, HH, II, JJ, AAA.

### E. Damages

All of Mr. Hart's medical expenses for the relevant time period were paid by the United States of America. Plaintiff has no claim for past or future medical expenses related to his care. JSF; Trial Tr., Vol. II at 11-12. Mr. Hart also has no claim for any past or future lost wages as a result of the care provided by Dr. Pan. JSF; Trial Tr., Vol. II at 4.

## II. Conclusions of Law

This Court has jurisdiction pursuant to 28 U.S.C. § 1346(b). In a case filed pursuant to the FTCA, the court applies the law of the state in which the acts complained of occurred. Goodman v. United States, 2 F.3d 291, 292–93 (8th Cir.1993) (citing 28 U.S.C. § 1346(b)). In this case, plaintiff's claims arise from the treatment he received at the St. Louis Veterans Administration Medical Center. Therefore, Missouri law applies.

Plaintiff has alleged a claim for medical malpractice. Under Missouri law, in order to establish a claim for negligence, a plaintiff must prove: "(1) the existence of a duty on the part of

the defendant to protect the plaintiff from injury, (2) a failure of the defendant to perform that duty, and (3) an injury proximately caused by the defendant's failure." Blevens v. Holcomb, 469 F.3d 692, 694 (8th Cir. 2006) (citing Krause v. U.S. Truck Co., 787 S.W.2d 708, 710 (Mo.1990) (en banc)). In a medical malpractice case, the plaintiff must show that the defendant failed to use "that degree of skill and learning ordinarily used under the same or similar circumstances by members of defendant's profession." Id. (quoting Swope v. Printz, 468 S.W.2d 34, 39 (Mo. 1971)). In most instances, "a plaintiff cannot state a prima facie case of medical negligence without expert testimony describing how the defendant's conduct fell below the applicable standard of care." Id. (citing Hart v. Steele, 416 S.W.2d 927, 931-32 (Mo. 1967)). The specific duty required of the defendant is defined by the profession, and an "expert witness is generally necessary to tell [the fact finder] what the defendant should or should not have done under the particular circumstances of the case and whether the doing of that act or the failure to do that act violated the standards of care of the profession." Ostrander v. O'Banion, 152 S.W.3d 333, 338 (Mo. Ct. App. 2005). Once the duty is established by expert testimony, whether a physician was negligent under the evidence presented becomes a question of fact for the fact finder. Lashmet v. McQueary, 954 S.W.2d 546, 551 (Mo. Ct. App. 1997). The standard of proof in civil actions is a preponderance of the evidence. State ex rel. Amrine v. Roper, 102 S.W.3d 541, 548 (Mo.2003) (en banc); Bonney v. Envtl. Eng'g, Inc., 224 S.W.3d 109, 120 (Mo. Ct. App. 2007). Thus, in order to prevail in this case, plaintiff must prove, by a preponderance of the evidence, that Dr. Pan beached the standard of care, and that the breach caused his injuries.

Plaintiff claims Dr. Pan was medically negligent in treating his cervical dystonia. Plaintiff argues Dr. Pan breached the applicable standard of care by administering to plaintiff Botox

injections that were too high in dose and too close in time. It is undisputed that targeted injections of Botox are a recognized method for treating the symptoms of cervical dystonia. It is also undisputed that Dr. Pan injected plaintiff with 300 units of Botox on August 20, 2007, and that plaintiff returned to her clinic, 46 days later, on October 5, 2007, complaining of pain. After examining plaintiff, Dr. Pan injected plaintiff with 400 additional units of Botox. The issue for the Court to decide as the finder of fact in this case is whether Dr. Pan violated the standard of care by employing this course of treatment.

The Court finds that the evidence does not support plaintiff's contention that the dosages of Botox were too high. Plaintiff's own expert testified that 300 units and 400 units of Botox were within the acceptable dosage range for treatment of cervical dystonia. The 400 unit dose was on the higher end of the range, but it was a recommended dose for treatment of cervical dystonia at the time. The Court finds Dr. Pan did not breach the standard of care based on the amount of Botox she injected.[1]

The real contested issue in this case is whether the time interval between the two Botox treatments was too short. The experts disagreed as to the time it takes for the pharmacological effects of Botox to wear off. Consequently, they disagreed as to what is a safe interval between the administration of Botox injections.

---

[1] Plaintiff argues that Dr. Pan has all but admitted that she breached the standard of care. Plaintiff testified, as did his wife, that during his first visit to Dr. Pan following his bouts of pneumonia, Dr. Pan exclaimed that she had overdosed plaintiff with Botox. In her testimony, Dr. Pan disputes that she made any such statement. The Court credits the testimony of Dr. Pan over the testimony of Mr. and Mrs. Hart. Mr. and Mrs. Hart both have more of a direct financial interest in the outcome of this case. In addition, Mr. Hart admitted to drug use that affects his memory, and he was convicted of a felony for misrepresentation to a senior. But even if the Court were to credit the Harts' testimony, the alleged statement does not prove plaintiff's claim. Dr. Gelblum, an expert in the field, testified that Dr. Pan's treatment was completely appropriate and she did not breach the standard of care.

Dr. Friedman and Dr. Gelblum both testified that the effects of Botox are transient. Dr. Friedman, however, testified that Botox remains in the body's system for at least two months. Therefore, according to Dr. Friedman, it is too risky to administer a second dose of Botox in an interval less than eight weeks, because there is a risk of cumulative dosing and an increased chance of adverse side effects. Dr. Friedman, like Dr. Pan, testified that the average interval between Botox injections is twelve weeks. He further testified that administering a second dosage of Botox within six weeks was "too risky," and the shortest interval he has administered treatment was eight weeks. Relying on Dr. Friedman's testimony, plaintiff claims that Dr. Pan failed to meet the requisite medical standard of care because she injected him with the second dose of Botox in an interval that was less than eight weeks.

Dr. Friedman's testimony was contradicted by the testimony of Dr. Gelblum. Dr. Gelblum testified that the effects of Botox last approximately eight weeks, but for some patients it lasts longer, and for others it is shorter. According to Dr. Gelblum, Dr. Pan's administration of 300 units of Botox on August 20, 2007, and 400 units of Botox on October 5, 2007, was within the standard of care and completely appropriate under the circumstances. He testified that had plaintiff presented to him on October 5, 2007, complaining of pain, he too would have injected him with more Botox, as there were no other effective treatment options.

The time it takes for the effects of Botox to wear off is significant in this case because when Mr. Hart returned to Dr. Pan on October 5, 2007, it is undisputed that he was in pain. When the doctor physically examined Mr. Hart on October 5, 2007, 46 days after the previous injections, she documented that Mr. Hart's cervical dystonia symptoms had returned – meaning she believed that the effect of the previous Botox injections had worn off. After reviewing the medical records and

13

taking into account Mr. Hart's symptoms as described, Dr. Gelblum agreed with Dr. Pan's assessment. Plaintiff argues, however, that the effect of the pervious Botox injections could not have worn off due to the timing. According to Dr. Friedman, the pharmacological effect of the Botox administered on August 20, 2007, would not have worn off in such a short period of time. Based on Dr. Friedman's testimony, plaintiff argues that his reports of pain on October 5, 2007, and two to three weeks prior, were most likely due to cervical degenerative disease or osteoarthritis in the neck, not the return of his cervical dystonia symptoms.

Dr. Gelblum debunked plaintiff's theory. Dr. Gelblum testified that Mr. Hart's disk disease had nothing to do with the muscles contracting with his cervical dystonia. Trial Tr., Vol. III at 18-19. In fact, according to Dr. Gelblum, any neurologist can differentiate between symptoms relating to someone presenting with the symptoms of cervical dystonia versus someone with degenerative disk disease. According to Dr. Gelblum, this is "neurology 101." Id. at 19.

There are no real disputed material facts in this case, and liability comes down to conflicting expert opinions. Dr. Friedman testified that Dr. Pan breached the standard of care by dosing Mr. Hart with more Botox after the effects of the previous treatment had not worn off, putting him at greater risk for the adverse side effects of the drug. He opines that it is likely Dr. Pan mistook the symptoms of degenerative disk disease for the return of cervical dystonia symptoms. Dr. Gelblum, on the other hand, testified that the effects of Botox can certainly wear off in 46 days, and had Mr. Hart presented to him with the same symptoms – symptoms of cervical dystonia – under the same circumstances he also would have injected Mr. Hart with 400 units of Botox. He testified that it is simple for a trained neurologist to distinguish between the symptoms of degenerative disk disease and those of cervical dystonia.

After hearing the testimony of both experts and reviewing the exhibits and record in this case, the Court finds Dr. Gelblum to be more credible than Dr. Friedman. Dr. Gelblum has more experience with Botox, as he treats patients with Botox suffering from cervical dystonia on almost a daily basis. The Court credits the opinion of Dr. Gelblum and finds that when Mr. Hart returned to Dr. Pan on October 5, 2007, he exhibited symptoms of cervical dystonia, which indicated that the effects of August 20, 2007 injections had worn off. Because Botox can wear off in less than eight weeks, it was appropriate and reasonable to administer 400 units of Botox, which was within the recommended dosage. There is no evidence that Dr. Pan exceeded any known recommended dosage and frequency in administering the Botox to Mr. Hart on August 20, 2007 and October 5, 2007.

There were also conflicting expert opinions as to whether plaintiff's current complaints of pain and difficulty breathing and swallowing can be attributed to the Botox treatments Dr. Pan administered on August 20, 2007, and October 5, 2007. Because Dr. Pan did not breach the standard of care, the Court need not determine whether Mr. Hart's alleged long-term injuries were caused by his Botox treatments.

### III. Conclusion

In sum, plaintiff has not established by a preponderance of the evidence that Dr. Pan breached the standard of care by injecting him with 400 units of Botox approximately six weeks after she had injected him with 300 units of Botox. Mr. Hart suffered well-known and well-documented side effects of Botox, but they were not the result of Dr. Pan's medical negligence. Furthermore, because the Court finds Dr. Pan did not breach the standard of care, it need not decide whether Mr. Hart's complaints of long-term injuries were the result of Dr. Pan's treatment.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff Richard Hart's claims against defendant United States of America are **DISMISSED.**

An appropriate judgment will accompany these Findings of Fact and Conclusions of Law.

                                     /s/ Charles A. Shaw
                                     **CHARLES A. SHAW**
                                     **UNITED STATES DISTRICT JUDGE**

Dated this  19th  day of September, 2012.